

# NUMBER 13-22-00328-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**ALTON CURRIE,**                                                                 **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                           **Appellee.**

---

### On appeal from the 85th District Court
### of Brazos County, Texas.

---

## MEMORANDUM OPINION

**Before Justices Tijerina, Silva, and Peña**
**Memorandum Opinion by Justice Tijerina**

Appellant Alton Currie appeals his conviction for two counts of aggravated assault against a public servant. *See* TEX. PENAL CODE ANN. § 22.02(b)(2)(B). Appellant received two concurrent twenty-five-year terms of incarceration. By five issues that we have reorganized and renumbered, appellant contends that the trial court (1) should have granted his request to include the lesser-included offense of deadly conduct in the jury

charge, (2) improperly admitted evidence of extraneous acts in the guilt/innocence phase of trial, (3) improperly admitted inadmissible photographs during the punishment phase of his trial, (4) erred by dismissing a juror after the jury had been empaneled and sworn, and (5) abused its discretion in denying appellant's motion for mistrial. By a sixth issue, appellant contends that he was denied a fair trial due to cumulative error. We affirm.[1]

## I.  DEADLY CONDUCT

By his first issue, appellant contends that he was entitled to a jury instruction on the lesser-included offense of deadly conduct. Specifically, appellant argues that the jury could have inferred from the evidence that he did not intentionally point his weapon at officers and instead acted recklessly. *See id.* (providing that a person commits the offense of deadly conduct if he recklessly places another person in danger of serious bodily injury).

### A.  Applicable Law and Standard of Review

> Upon the defendant's request, a lesser-included offense instruction shall be included in the jury charge if:
>
> (1)  the requested charge is for a lesser-included offense of the charged offense; and
>
> (2)  there is some evidence that, if the defendant is guilty, he is guilty only of the lesser offense.

*Guzman v. State*, 188 S.W.3d 185, 188 (Tex. Crim. App. 2006) (cleaned up).

Whether one offense is a lesser offense of another is a question of law, which does not depend on the evidence. *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011).

---

[1] This appeal was transferred to this Court from the Tenth Court of Appeals pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

We determine if deadly conduct is a lesser-included offense of aggravated assault against a public servant by comparing the elements "to determine whether, in proving [aggravated assault against a public servant,] as it was alleged in the indictment, the State necessarily had to prove all of the elements of deadly conduct, plus something more." *See Guzman*, 188 S.W.3d at 189. We review the pleadings, and we compare the statutory elements as charged in the indictment to the requested lesser offense's elements. *Amaro v. State*, 287 S.W.3d 825, 828 (Tex. App.—Waco 2009, pet. ref'd). If deadly conduct is a lesser-included offense of aggravated assault against a public servant, the first prong of the test is met, and we then analyze the second prong. *Guzman*, 188 S.W.3d at 189.

Under the second prong, we must determine if the record contains some evidence that would support a jury's rational finding that if appellant is guilty, "he is guilty *only* of deadly conduct, not [aggravated assault against a public servant]." *See id.* at 190. This prong is met if there is "(1) evidence that directly refutes or negates other evidence establishing the greater offense and raises the lesser-included offense or (2) evidence that is susceptible to different interpretations, one of which refutes or negates an element of the greater offense and raises the lesser offense." *Ritcherson v. State*, 568 S.W.3d 667, 671 (Tex. Crim. App. 2018).

"An instruction on a lesser-included offense is required only when there is some admitted evidence directly germane to that offense." *Roy v. State*, 509 S.W.3d 315, 317 (Tex. Crim. App. 2017). We perform our analysis of the second prong by reviewing all the evidence "without regard to the evidence's credibility or potential contradictions or conflicts." *Id.* The instruction on the lesser-included offense is required if there is more

3

than a scintilla of affirmative evidence establishing "that the lesser-included offense is a valid, rational alternative to the charged offense." *Id.* (citing *Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011) (internal quotations omitted)). "Meeting this threshold requires more than mere speculation—it requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Cavazos v. State*, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012).

As charged here, to convict appellant of aggravated assault against a public servant, the State had to prove that he committed the offense of assault and used or exhibited a deadly weapon during the commission of the assault. *See* TEX. PENAL CODE ANN. § 22.02. Appellant committed the offense of assault as charged in the indictment, if he intentionally or knowingly threatened a person that he knew was a public servant while lawfully discharging his official duty with imminent bodily injury, and he used a deadly weapon. *Id.* at § 22.01. To have committed deadly conduct, appellant must have recklessly engaged in conduct that placed another person in imminent danger of serious bodily injury. *Id.* at § 22.05(a). Reckless conduct occurs when the person is aware of the risk but consciously disregards a substantial and unjustifiable risk that the circumstances exist or that the result will occur. *See id.* § 6.03(c).

**B.     Pertinent Facts**

Officers Alexander Tran and Caleb Sanders testified that on August 24, 2020, they responded to reports of a potential shooting or shots being fired. Officer Tran stated that the officers set up a perimeter of the area where shots were heard to prevent the public from entering.

4

Officer Tran testified that appellant drove a truck to his position, rolled down his window, mumbled something to Officer Tran, and appellant turned his body towards the vehicle's center console. Officer Tran observed appellant pick up a gun and point it at him. Specifically, Officer Tran said that he "observed" appellant "grab the pistol and then turn it towards [him]." Officer Tran continued, "The barrel was facing towards my chest at which point I identified it was a gun." Officer Tran stated, "He points it at me to where if he were to pull the trigger, the bullet would have entered my body—would have caused me bodily harm."

Officer Tran testified that he commanded appellant to "drop the gun"; Officer Tran "grabbed the gun in an attempt to move the barrel out of [his] direction." Officer Tran stated that a short struggle ensued through the truck's window. Officer Tran pushed the gun, broke contact with the gun, and appellant retreated to the "back of the truck." The trial court admitted State's Exhibit 5, which is a recording of the incident from Officer Tran's body camera. Officer Tran testified that the video shows appellant "reaching towards a pistol that's . . . on top of the center console of the truck." The trial court admitted State's Exhibits 7 and 8, which Officer Tran described as "a splice of [his] video recording where it slows down enough to where you can actually see the gun." Officer Tran said that State's Exhibit 7 shows "where [appellant] presented the gun . . . ." State's Exhibit 8 shows "[a] magnified snapshot of the gun," which shows that appellant's finger is on the gun's trigger while pointing the gun at Officer Tran. The State asked Officer Tran to describe what he felt when appellant pointed the gun at him; Officer Tran replied, "I was thinking I was going to get shot and not make it home to my family." Officer Tran

5

agreed with the State that he was in fear for his life "[a]s well as [his] teammates' life."

Officer Tran stated that appellant then drove his truck towards Officer Sanders's position, who was "further down the road." Officer Tran broadcasted that a person with a gun was approaching Officer Sanders. According to Officer Sanders, he heard the broadcast, while observing appellant driving his vehicle in his direction. Officer Sanders testified that he moved to the back of his patrol car for cover, and as appellant approached his position, he saw appellant pointing the gun at him. Specifically, Officer Sanders said, "I saw the barrel of a handgun pointed in my direction." Officer Sanders demonstrated for the jury how appellant held the gun and explained, "It was being held over the dashboard by [appellant], held up and down; barrel was pointed directly at me." According to Officer Sanders, the reason the video of the incident shows him jumping back when appellant passed by him was "[b]ecause seeing that gun pointed at me startled me just a little." Officer Sanders testified that he knew that appellant saw him because appellant "was looking at" him. Officer Sanders said, "I can say I'm pretty confident that [the gun] was aimed at me, yes, because I could see down the barrel."

Appellant then drove his truck off the road and drove through a pasture. Officers Tran and Sanders pursued appellant, and Officer Austin Garretson joined the pursuit. Eventually, appellant stopped and exited his truck, and the officers took him into custody. Officer Garretson testified that he saw the gun on top of the truck's center console.

Officers Tran and Sanders transported appellant to the hospital, where according to Officer Tran, appellant was "very threatening, non-compliant." Specifically, Officer Tran said, "[appellant] made threats to harm my children, my wife; to get a large amount of

6

people to come against me and hurt me and my partners as well as, again, the medical clinicians that were trying to provide him medical services." The State asked Officer Tran if appellant made "statements . . . that he was going to kill" him; Officer Tran replied, "Yes, he did." According to Officer Tran, appellant also threatened to kill Officer Sanders. Officer Tran testified that appellant "was trying to pull [his handcuffs] at its maximum extension, trying to free himself from those handcuffs as well as on multiple occasions attempt[ing] to strike me while he was restrained." Officer Sanders relayed that appellant said that "he was going to take the handcuffs and bash my skull in."

On redirect examination by the State, Officer Tran stated that appellant said, "Ya'll F'ed up by not killing me," and explained appellant said,

> once he frees himself from the handcuffs he's going to use the handcuffs to stab me in the eye; he's going to hurt Officer Sanders; he's going to get 60 of his local buddies to come jump on me, my family; he mentioned that he was part of another organization that had 30,000 or so people that will come to his aid, free him from his arrest, and then take vengeance upon me and my partner Officer Sanders.

Officers Tran and Sanders eventually transported appellant to the jail. The forensic crime scene unit collected a loaded Kimber .45 caliber semiautomatic handgun with the hammer fully back and the safety off from the top of appellant's truck's console, and the unit found two magazines loaded with ".45 caliber ACP bullets" inside the truck's center console. According to Officer Eric Henderson, someone would have had to have "consciously pull[ed] the hammer back or cock it so the hammer locks back to fire." Officer Henderson testified that someone not prepared to use the gun would not have had his finger on the trigger, and instead, the person would have put his finger "usually above the trigger parallel with the slide." Officer Henderson said, "That's where I would hold it until I

7

had it—thought I was going to have to fire it, yes."

**C.      Analysis**

Deadly conduct has been determined to be a lesser-included offense of aggravated assault against a public servant. *See Amaro*, 287 S.W.3d at 829. Thus, we will analyze whether the second prong is met.

The evidence at trial established that appellant intentionally or knowingly pointed a gun at Officer Tran, who testified that appellant pulled out a gun, and pointed it at him. Additionally, Officer Sanders stated that appellant pointed the gun directly at him with his finger on the trigger. Moreover, there is nothing in the record supporting a finding that appellant merely acted recklessly. *See Cavazos*, 382 S.W.3d at 385. On appeal, appellant argues that he may have *accidently* pointed the gun at the officers. However, there is no evidence supporting such a finding. *See id.* Instead, the evidence shows that appellant pointed a loaded gun with his finger on the trigger at two officers, appellant struggled with Officer Tran for control of the gun, appellant attempted to flee from the officers, and later threatened to kill both officers and their families.

We are unable to conclude that appellant's actions were merely reckless, and Officers Tran's and Sanders's testimonies that appellant pointed a loaded gun with his finger on the trigger would have precluded a rational jury from finding him guilty only of deadly conduct. *See* TEX. PENAL CODE ANN. § 6.03(c); *see also Benavides v. State*, No. 08-07-00193-CR, 2009 WL 3031175, at *1 (Tex. App.—El Paso Sept. 23, 2009, pet. ref'd) (mem. op., not designated for publication) (concluding that the defendant was not entitled to an instruction for deadly conduct as a lesser-included offense of aggravated assault

8

because the evidence established that the defendant intentionally pointed the gun at the victim). While on appeal appellant suggests that he did not intend to harm anyone or threaten the officers because he *accidently* pointed the gun at them, the evidence that appellant pointed the loaded gun at both officers allowed the jury to find that appellant intended to cause or knew that he would cause the officers to fear imminent bodily injury. *See* TEX. PENAL CODE ANN. §§ 6.03(b); 22.02(a)(2); *Godsey v. State*, 719 S.W.2d 578, 584 (Tex. Crim. App. 1986) (explaining that when we are determining whether the evidence supports a finding of recklessness, even a statement that a defendant did not intend to kill the victim "cannot be plucked out of the record and examined in a vacuum"); *Martinez v. State*, 16 S.W.3d 845, 847 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). The only evidence regarding appellant's mental state was presented by the State and included witnesses who stated that he pointed a loaded gun at them with his finger on the trigger while the officers were attempting to detain appellant. There was no evidence negating that appellant acted knowingly or intentionally.

Because the evidence shows that appellant acted intentionally or knowingly when he pointed the gun at the officers, and there is no evidence that appellant merely acted recklessly, we conclude that appellant was not entitled to an instruction on the lesser-included offense of deadly conduct. *See Guzman*, 188 S.W.3d at 188; *Dixon v. State*, 358 S.W.3d 250, 259 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (explaining that the defendant had not testified "about any lack of intent to strike [the complainant], nor does any evidence from any source show he lacked the intentional or knowing mental state" and that "[i]nstead, the only evidence shows he argued with [the complainant] and chased

her in his truck while she ran away screaming, narrowly missing her as she rolled out of the way into a hole under a house that he struck"); *see also Stephenson v. State*, No. 04-22-00031-CR, 2023 WL 4337711, at *5–6 (Tex. App.—San Antonio July 5, 2023, no pet. filed.) (mem. op., not designated for publication) (relying on *Dixon,* 358 S.W.3d at 258, and overruling the appellant's complaint that the trial court should have provided the lesser-included offense instruction for reckless conduct because "there is no evidence that [the appellant] lacked the intentional or knowing mental state; and, when viewed in the context of the entire record, the statements that [the appellant] highlights do not negate intent"); *Benavides*, 2009 WL 3031175, at *1 (concluding that the appellant acted intentionally and was not entitled to an instruction on deadly conduct because the evidence showed that the appellant pointed a gun at the victim in order for the victim to let him go and leave him alone and then pointed the gun at the victim again to scare the victim away). Accordingly, we conclude that the trial court did not abuse its discretion in refusing to instruct the jury on the lesser-included offense of deadly conduct. *See Dixon*, 358 S.W.3d at 258 ("We decline to hold that the trial court abused its discretion . . . when the testimony as a whole does not negate intent."). We overrule appellant's first issue.

## II.  ADMISSION OF EXTRANEOUS EVIDENCE

By his second issue and several sub-issues, appellant contends that the trial court erred by allowing evidence of extraneous acts in the guilt/innocence phase of trial. Specifically, appellant complains that during the guilt/innocence phase of the trial, the trial court improperly admitted extraneous evidence that (1) there had been either "shots fired"

or a "shooting"[2]; and (2) a murder had occurred.

## A. Applicable Law

Evidence that a defendant may have committed other crimes or bad acts "cannot be introduced at the guilt-innocence phase to show that the defendant acted in conformity with his criminal nature and therefore committed the crime for which he is on trial." *Lockhart v. State*, 847 S.W.2d 568, 570 (Tex. Crim. App. 1992). However, extraneous offense evidence may be admissible for another purpose such as to prove motive, intent, absence of mistake, opportunity, preparations, plan, knowledge, identity, or absence of mistake or lack of accident. TEX. R. EVID. 404(b). To show that an act constitutes evidence of an extraneous offense, the evidence must show that a crime or bad act occurred and that the defendant was connected to that crime or bad act. *Lockhart*, 847 S.W.2d at 573; *Johnson v. State*, 190 S.W.3d 838, 839–40 (Tex. App.—Forth Worth 2006, no pet.) (holding that the trial court did not err in admitting audiotape because the appellate court was "unable to identify any evidence of an extraneous offense or bad act on the audiotape").

## B. Evidence of a Shooting or that Shots Had Been Fired

---

[2] Appellant in a first sub-issue to his second issue, also argues that evidence of shots being fired or of a shooting occurring was not relevant. Appellant does not cite to any portion of this voluminous record wherein he objected to this evidence on that ground. *See* TEX. R. APP. P. 38.1(i).

Moreover, the pre-trial hearing held by the trial court concerned whether the trial court should grant or deny appellant's motion in limine. However, appellant's motion merely requested that the State not be permitted to mention any evidence of extraneous offenses or acts of misconduct to the jury until the admissibility of such evidence had been established outside the jury's presence. "That is precisely the proper purpose of a motion *in limine*." *Geuder v. State*, 115 S.W.3d 11, 14–15 (Tex. Crim. App. 2003). "A trial judge's grant or denial of a motion *in limine* is a preliminary ruling only and normally preserves nothing for appellate review." *Id.* Therefore, appellant has not shown that his relevance objection was preserved. *See id.* We overrule appellant's first sub-issue to his second issue.

11

Here, the evidence presented at trial merely showed that Officers Tran and Sanders had been dispatched to the area due to reports of either shots being fired or a shooting occurring. The trial court did not admit any evidence during the guilt/innocence phase of appellant's trial either showing that appellant was involved in the shooting or that appellant had been accused of firing the shots that had been reported to the officers. "If the evidence fails to show . . . that the accused was connected to the offense, then evidence of an extraneous offense is not established." *McKay v. State*, 707 S.W.2d 23, 32 (Tex. Crim. App. 1985) (en banc). Therefore, because the evidence did not show that appellant committed the crime or bad act of either firing shots or shooting a gun, no improper extraneous offense evidence was admitted. *See id.*; *see also Montemayor v. State*, No. 13-14-00173-CR, 2016 WL 4272384, at *4 (Tex. App.—Corpus Christi–Edinburg Aug. 11, 2016, pet. ref'd) (mem. op., not designated for publication) (concluding that "no extraneous evidence was offered or admitted because neither the witness nor the State referenced either a crime or bad act committed by [the appellant]").

Accordingly, the trial court did not abuse its discretion in admitting the complained-of evidence in this manner. *See Lockhart*, 847 S.W.2d at 573 (explaining that because a "'diary' did not tend to connect [the] appellant to any prior bad acts or crimes appellant may have committed" and "it did not depict *any* criminal activity or bad acts, let alone those offered at his trial," the "[diary] was not excludable as an extraneous offense"); *Johnson*, 190 S.W.3d at 839–40; *see also Wood v. State*, No. 13-10-00556-CR, 2013 WL 388150, at *6 (Tex. App.—Corpus Christi–Edinburg Jan. 31, 2013, no pet.) (mem. op., not designated for publication) (following *Lockhart* and determining that recorded

12

jailhouse phone calls did not tend to connect the appellant "to any prior bad acts or crimes that he may have committed," and therefore, the phone calls did not constitute evidence of an extraneous offense or bad act). We overrule appellant's second issue.

By a second sub-issue to his second issue, appellant contends the evidence that the officers were responding to a call that shots were fired or a shooting occurred "should have been excluded because its probative value is substantially outweighed by the danger of unfair prejudice." Appellant bases his argument on an assertion that the evidence constituted extraneous offense evidence and acknowledges in his brief that there is no evidence "that [a]ppellant was the person involved in the shooting incident or that he fired any shots during this event." Appellant then claims, without citation to any authority, that "[e]vidence concerning a matter the State is not required to prove can have little, if any, probative value." According to appellant, the jury could have reasonably inferred that "the prior shooting somehow involved [a]ppellant and misled the jury into believing that the charged offenses were somehow related to the introduced evidence of the shooting." Without proper argument and citation to appropriate authority, we are unable to conclude that appellant's assertions require reversal. *See* TEX. R. APP. P. 38.1(i); *see also Lockhart*, 847 S.W.2d at 571 ("[E]vidence of extraneous offenses that are indivisibly connected to the charged offense and necessary to the State's case in proving the charged offense may be admissible as relevant evidence to explain the context of the offense for which the defendant is on trial."). Accordingly, we overrule appellant's second sub-issue to his second issue.

13

## C.      Evidence that a Murder Occurred

Next, by a third sub-issue to his second issue, appellant complains that the trial court admitted evidence that a murder occurred or evidence "pertaining to the murder." However, appellant does not specifically identify in his brief which evidence was introduced during the guilt/innocence phase of the trial that a murder occurred or that pertained to a murder. Our review of the record cites provided by appellant shows that at his trial, after the State published a video to the jury, he objected to it on the basis that someone can be heard on an officer's radio stating, "I have one that's unconscious. One that's unresponsive." However, appellant did not object to admission of this video prior to the trial court's admission and publication to the jury. *See* TEX. R. APP. P. 33.1.

Nonetheless, assuming without deciding that the issue is preserved and these statements pertained to a murder or are evidence that a murder occurred, appellant does not specifically state that the complained-of evidence connected him to the murder. And, upon our review of this evidence, there is nothing in the record connecting him to a murder. *See McKay*, 707 S.W.2d at 32. Therefore, because the evidence did not show that appellant committed the murder, no improper extraneous offense evidence was admitted about the murder. *See id.*; *see also Montemayor*, 2016 WL 4272384, at *4. Therefore, the trial court did not abuse its discretion by admitting this evidence. We overrule appellant's third sub-issue to his second issue.

### III.      ADMISSION OF PHOTOGRAPHS AT THE PUNISHMENT PHASE

By what we construe as appellant's third issue and multiple sub-issues, appellant contends that at the punishment phase, the trial court improperly admitted evidence

14

related to the offense of murder, an offense for which according to appellant, he has not been tried. Specifically, appellant complains about State's Exhibits 32, 33, 45, 46, and 47, which are photographs of the murder scene and of the victim.

## A.    Pertinent Facts

During the punishment phase of appellant's trial, evidence was presented that after fleeing from Officers Tran and Sanders, appellant eventually turned onto a residential driveway (the murder scene) where he was arrested and placed in custody. The trial court admitted State's Exhibit 21, a recording of a 911 call made by Jarrell Currie wherein he reported that appellant, his cousin, shot his friend, James Zikus.[3] Jarrell reported that he left the murder scene because appellant had pointed the gun at him. Jarrell stated that appellant was still in the area, and he did not want to go back to the murder scene. According to Jarrell, appellant used a .45 caliber gun to shoot Zikus, and he was not sure if Zikus was alive. Jarrell stated that when appellant pulled out his gun, he told appellant to put the gun away and that is when appellant shot Zikus.[4]

Officer Jared Watkins testified that he went to the murder scene on the same date that appellant committed the offenses of aggravated assault against a public servant. Officer Watkins stated that he had been dispatched to the murder scene due to a report that "shots had been fired and possibly someone was injured." Officer Watkins testified that he parked his patrol vehicle, and he encountered Jarrell. Officer Watkins stated that once appellant had been removed from the murder scene, he discovered a "deceased

---

[3] The record shows that Jarrell died prior to appellant's trial.

[4] Appellant objected to State's Exhibit 21 based on hearsay, the right of confrontation, and the right to due process. The trial court overruled appellant's objections, which he does not challenge on appeal.

15

individual."

The State offered State's Exhibit 22, which was the video taken from Officer Watkins's body camera. Appellant objected based on hearsay, the confrontation clause, and argued that it was cumulative. The State argued for admission and then explained that Officer Watkins's body camera "shows him going in, finding the victim, removing the victim from the scene because it's still an active scene when [appellant] arrives back to the [murder scene] and parks right outside the doors where he's still in direct line of sight and [has the] ability to fire his weapon." Appellant's trial counsel replied, "We don't object to that part. We don't object to that part of the video," and stated that the objection was in reference to "[Jarrell's] statement." The trial court overruled appellant's objections and admitted State's Exhibit 22.

State's Exhibit 22 shows Officer Watkins's body-camera video, wherein Jarrell explains to Officer Watkins that a shooting had occurred. Officer Watkins instructed Jarrell to write down the name of the shooter and the victim; Jarrell reported that appellant was the shooter and Zikus was the victim. Officer Watkins's body-camera video captured when appellant parked his truck at the murder scene prior to being arrested. The video shows Officer Watkins dragging Zikus's body from where he was lying down.

The State then offered State's Exhibits 23 through 48, which are "stillshots" taken from State's Exhibit 22. State's Exhibit 23 through 26 show various angles of the scene, with portions of Zikus's body shown. State's Exhibits 27 through 30 are pictures of the property where the murder occurred. However, there is nothing in State's Exhibits 27 through 30 showing Zikus's body. State's Exhibit 31 through 33 are pictures of the

property, which show a blue blanket covering Zikus's body. State's Exhibits 34 through 44 are pictures of the murder scene, and Zikus's body is not shown.

State's Exhibit 45 is a picture of what appears to be blood stains leading to where Zikus's body was located. Zikus's body is not shown in the picture; however, a portion of the blue blanket covering Zikus's body is partially shown. State's Exhibit 46 is a picture of Zikus's body showing what appears to be a bullet wound to the upper portion of the left side of his chest. State's Exhibit 47 is a close-up picture of Zikus's face.

As to State's Exhibit 45, appellant said, "[W]e object on the basis that this particular photograph has no value to the jury, only to peak their emotions or inflame them. Just shows a drag mark when the cops removed [Zikus] from where he was to the outside. Object to that being inflammatory." As to State's Exhibits 46 and 47, appellant explained that those photographs, which are photos "of [Zikus] outside where the officers had moved him" do not serve a "purpose other than to appeal to [the] jury's emotions or inflame the jury. No evidential value to those photographs." The State responded that it had to prove that Zikus was murdered and that Zikus "is the person that an autopsy was done on" and that "he was the person that was shot." The State explained that one of the objected-to pictures was the "[o]nly picture of his face up close to identify him." As to State's Exhibit 45, the State argued that the video had already shown Officer Watkins dragging Zikus's body. The trial court then overruled appellant's objections to State's Exhibits 45, 46, and 47, which were then admitted.

Officer Watkins testified that when he moved Zikus's body, Zikus did not respond and that it was "highly possible that he was" already deceased. Officer Watkins stated

17

that once he knew that appellant had been taken into custody, he looked at Zikus's body and "observed a—what appeared to be a bullet hole in his chest." According to Officer Watkins, when the paramedics arrived, he "observed" Zikus's back "to see if there was an exit wound"; however, Officer Watkins did not see one.

Officer Henderson testified that he processed the murder scene, and he observed Zikus's body lying "on the ground deceased in front of a Ford pickup truck that was at one of the entrances to the shed." Officer Henderson stated that State's Exhibit 39 shows among other things "[a] .45 caliber cartridge casing," while State's Exhibit 41 is a picture of "the cartridge casing." Officer Henderson agreed that he had previously testified during the guilt/innocence portion of the trial that he found a .45 caliber handgun in appellant's truck where the .45 caliber casing would have fit inside.

Officer Henderson testified that he was present when Zikus's body was removed by the funeral home from the murder scene. Officer Henderson said that he observed a gunshot wound "toward the left side" of Zikus's chest, "not too far from the heart I would imagine"; however, when Zikus's body was turned over, he did not observe an exit wound. According to Officer Henderson, he subsequently "learn[ed]" that Zikus's body did have an exit wound.

Mike Fleeman, a "drywall finisher," testified that he had known Zikus since his teenage years and that he had met appellant "at a biker bar" in 2009. The three men all rode Harley-Davidson bikes. According to Fleeman, the men would congregate at Jarrell's property to do mechanical work on their motorcycles, play dice, and to drink alcohol. Fleeman testified that appellant stayed at Jarrell's property in a camper that was located

18

next to the garage, while Jarrell stayed in a home on the property. Fleeman stated that every time that he saw appellant, "he had a gun on him," which "was always within reach if it wasn't on his person" and which appellant kept "[i]n a Versacarry holster." Fleeman identified appellant's holster as that shown in State's Exhibit 59.

The State showed Fleeman State's Exhibit 64, which is a picture of Zikus's face taken after his death. Appellant did not object. The State asked Fleeman to identify the person shown in the picture, and Fleeman replied, "James Zikus." Fleeman identified appellant's holster shown in State's Exhibit 62, and appellant's gun found in his truck as shown in State's Exhibit 18. Fleeman relayed that on an occasion prior to the murder he and Jarrell were sitting and "talking, and [appellant] just pulled—just pulled—pointed a gun at [him]. Pointed it right at [his] face." The State asked, "[W]hich gun did he point at you?" Fleeman replied, "That Kimber that you just showed me." Fleeman testified that the pair had not been arguing when appellant "pointed [the gun] right at [his] face." Fleeman said that he grabbed the gun "and took it," and he then "emptied the magazine . . . emptied the chamber, and handed those to Jarrell . . . and . . . stuck the pistol between [his] legs."

Ryan Mudd, a firearms and tool mark examiner with the Department of Public Safety crime lab in Austin, Texas, testified that he examined the gun found in appellant's truck, a .45 caliber cartridge case found at the murder scene and what was marked State's Exhibit 61, which was "a plastic bag containing a fired bullet . . . ." Mudd testified that the "cartridge [found at the murder scene] was fired in [appellant's] firearm." Mudd further determined that the bullet had been fired from appellant's gun.

19

Vickie Willoughby, the Travis County Medical Examiner, testified that she performed an autopsy on Zikus's body. During Willoughby's testimony, the State offered State's Exhibits 63 through 71, which are pictures of Zikus's face and of his body where the bullet entered and where the bullet exited.

**B.     State's Exhibits 45, 46, and 47**

By his third issue, appellant argues that the trial court improperly admitted State's Exhibits 45, 46, and 47 because "[t]he State had no compelling need for the exhibits to which [a]ppellant objected." During the trial, appellant objected to State's Exhibit 45 on the basis "that this particular photograph has no value to the jury, only to peak their emotions or inflame them. Just shows a drag mark when the cops removed [Zikus] from where he was to the outside. Object to that being inflammatory." Although appellant generally cites authority that evidence must be relevant, appellant does not provide a legal analysis explaining why State's Exhibit 45 has no value to the jury or is inflammatory. *See* TEX. R. APP. P. 38.1(i). Likewise, although appellant objected to State's Exhibits 46 and 47 on the basis that they did not serve a "purpose other than to appeal to [the] jury's emotions or inflame the jury" and have no "evidential value," appellant does not provide legal analysis with citation to appropriate authority explaining how these exhibits were inadmissible. *See id.* Therefore, we conclude that this issue is inadequately briefed. *See id.*

Moreover, as to State's Exhibits 46 and 47, appellant acknowledges that autopsy photos showing the entry wounds and Zikus's face were admitted without objection. State's Exhibit 63 is a picture of Zikus's face and torso with his shirt lifted showing his

20

chest. State's Exhibit 64 is a picture of Zikus's face. State's Exhibit 66 is a picture of Zikus's nude torso. State's Exhibits 67 and 68 are close-up pictures of the entry wound on Zikus's chest. Appellant does not challenge admission of these exhibits on appeal, and these images are cumulative of the objected-to exhibits. *See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (en banc) ("[O]verruling an objection to [the admission of] evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling."). Thus, admission of State's Exhibits 47 and 48 does not constitute reversible error because the same evidence was properly admitted elsewhere. *See id.*

Additionally, appellant has not shown on appeal that even assuming error, the trial court's admission of State's Exhibits 45 through 47 caused the rendition of an improper verdict. *See* TEX. R. APP. P. 44.2(b); *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013) (remanded the case to the court of appeals for a harm analysis after determining that the trial court violated Rule 403); *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (explaining that non-constitutional error does not occur if the defendant's substantial rights are not affected by the erroneous admission of evidence and that substantial rights are not affected "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.").[5] We overrule appellant's third issue.

---

[5] Appellant does not state that his substantial rights were affected, and he does not explain with citation to pertinent authority how his substantial rights were affected after reviewing the record as a whole. *See* TEX. R. APP. P. 38.1(i).

## C.    State's Exhibits 32 and 33

By what we construe as a first sub-issue to his third issue, appellant states in his brief that "each photograph [labeled State's Exhibits 32 and 33 was] taken after the body [was] removed from its original location at the scene," and implies by citing *Taylor v. State*, that the trial court improperly admitted those exhibits because "[o]rdinarily, admitting a photograph taken during a police officer's investigation would be admissible if it is taken before the body is removed from the scene of the killing." 491 S.W.2d 922, 923 (Tex. Crim. App. 1973). However, in the trial court, appellant offered no objection to State's Exhibits 32 and 33. Therefore, this issue is not preserved for our review. *See* Tex. R. App. P. 33.1(a). We overrule appellant's first sub-issue to his third issue.[6]

## D.    State's Exhibit 61

Finally, by a second sub-issue to his third issue, appellant contends that the trial court improperly admitted State's Exhibit 61. Specifically, appellant argues that State's Exhibit 61 was not material. The State responds that State's Exhibit 61 was relevant to whether appellant shot and killed Zikus.

### 1.    Pertinent Facts

State's Exhibit 61 is a "spent bullet," which the State "conditionally offer[ed]" during Officer Henderson's testimony. Appellant first objected to the admission of State's Exhibit 61 on the basis that "[t]here's no foundation laid for where that bullet was found, how it was recovered. Nothing." The trial court overruled appellant's objection.

---

[6] Appellant also argues that the photographs were not relevant, or if relevant, the probative value was substantially outweighed by the "danger of one or more matters identified in Rule 103." However, at trial, appellant did not object to State's Exhibits 32 and 33 on the basis that they were not relevant or based on Rule 103. *See* Tex. R. App. P. 33.1.

22

After Officer Henderson testified that he received State's Exhibit 61 from Jarrell, the State offered it "conditionally," and appellant "Renew[ed his] objections from earlier." The trial court "conditionally accepted" but instructed, "It's not been entered as an exhibit yet."

Subsequently, the State asked Mudd to look at State's Exhibit 61, and Mudd indicated that he recognized it. The State offered State's Exhibit 61, and appellant generally objected that it was not relevant and said, "There's nothing on the record here, there's nothing before this jury that that bullet even came from this scene, had anything to do with this case." Appellant stated, "We would object to relevance for this particular bullet that just appeared." The trial court overruled appellant's objections and admitted State's Exhibit 61 "for all purposes."

### 2. Applicable Law

Evidence is relevant if it makes the existence of a "fact more or less probable than it would be without the evidence" and if it is material. TEX. R. EVID. 401. For evidence to be considered relevant, it "must be both material—that is, it must be offered for a proposition that is of consequence to the determination of the case—and probative, such that it makes the existence of the fact more or less probable than it would otherwise be without the evidence." *Boudreaux v. State*, 631 S.W.3d 319, 332 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) (citing *Henley v. State*, 493 S.W.3d 77, 83 (Tex. Crim. App. 2016)).

During the punishment phase of trial, evidence of extraneous offenses is admissible for any relevant purpose "but only if the State can offer proof that would allow

23

a reasonable fact-finder to conclude, beyond a reasonable doubt, that the defendant could be held criminally responsible for that act." *Delgado v. State*, 235 S.W.3d 244, 252 (Tex. Crim. App. 2007); *see also* TEX. CODE CRIM. PROC. ANN. art. 37.07 (providing that at the punishment phase, "evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act . . . regardless of whether he has previously been charged with or finally convicted of the crime or act").

### 3. Analysis

Appellant specifically argues on appeal that State's Exhibit 61 is not material and therefore not relevant. At trial, appellant objected to admission of State's Exhibit 61 on the basis that it lacked a foundation and that it was not relevant.

As previously set out, evidence of extraneous offenses is admissible during the punishment phase of trial for any relevant purpose. *Delgado*, 235 S.W.3d at 252; *see also* TEX. CODE CRIM. PROC. ANN. art. 37.07. The State offered State's Exhibit 61, the spent bullet, to prove that appellant committed the extraneous offense of murder by shooting Zikus. Thus, State's Exhibit 61 was offered for a proposition that is of consequence to the determination of the case, and it was therefore material. *See Boudreaux,* 631 S.W.3d at 332. Thus, the trial court did not abuse its discretion by admitting it. *See Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019) (setting out that we review the trial court's

decision to admit evidence for an abuse of discretion).

Nonetheless, even if it were error, appellant was not harmed by the admission of the spent shell casing because there was other evidence linking appellant to Zikus's murder. *See Wishert v. State*, 654 S.W.3d 317, 332 (Tex. App.—Eastland 2022, pet. ref'd) (citing TEX. R. APP. P. 44.2(b) ("The trial court's erroneous admission of evidence does not result in constitutional error; therefore, it will be disregarded if the error did not affect the defendant's substantial rights.")). The trial court admitted the recording of the 911 call wherein Jarrell told the dispatcher that appellant had shot Zikus. In addition, the trial court admitted body camera footage wherein Jarrell reported to Officer Watkins that appellant shot Zikus with his gun, which the evidence showed was a .45 Kimber. Given that the trial court admitted other evidence that appellant murdered Zikus, we cannot conclude that State's Exhibit 61 influenced the jury's determination of punishment. *See id.* ("A substantial right is implicated when the trial court's error had a substantial or injurious effect or influence in determining the jury's verdict," and we must only reverse if after reviewing the whole record, we do not have a fair assurance that the error did not affect the jury's verdict). We overrule appellant's second sub-issue to his third issue.

## IV. MOTIONS FOR MISTRIAL

By his fourth issue, appellant contends that the trial court abused its discretion by denying his motion for a mistrial because during voir dire, a juror failed to disclose that she was related to a person who is a law enforcement officer. By his fifth issue, appellant contends that the trial court abused its discretion when it denied his motion for mistrial on the basis that the "jury heard prejudicial extraneous offense statements contained in

25

State's Exhibit 5A."

## A.    Applicable Law

The trial court may grant a mistrial in "'extreme circumstances' for a narrow class of highly prejudicial and incurable errors." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) (quoting *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)). The trial court should grant a mistrial "'only when residual prejudice remains' after less drastic alternatives are explored." *Id.* at 884–85 (quoting *Barnett v. State*, 161 S.W.3d 128, 134 (Tex. Crim. App. 2005)). "Less drastic alternatives include instructing the jury 'to consider as evidence only the testimony and exhibits admitted through witnesses on the stand,' and, questioning the jury 'about the extent of any prejudice, if the instructions alone do not sufficiently cure the problem.'" *See id.* at 885 (quoting *Arizona v. Washington*, 434 U.S. 497, 522 (1978)). We review the denial of a motion for mistrial for an abuse of discretion. *Id.* at 884.

## B.    Dismissed Juror

### 1.    Applicable Law

A defendant is entitled to a trial before an impartial jury. U.S. CONST. amend. VI; *Franklin v. State*, 138 S.W.3d 351, 354 (Tex. Crim. App. 2004). The parties are denied an opportunity to exercise peremptory challenges and challenges for cause when jurors fail to disclose material information during the voir dire process. *Franklin*, 138 S.W.3d at 354 (citing *Salazar v. State*, 562 S.W.2d 480, 482 (Tex. Crim. App. 1978)). The failure to disclose material information during voir dire hampers the parties' selection of a disinterested and impartial jury. *Id.*

Any information that has "any potential for prejudice or bias" constitutes material information. *Decker v. State*, 717 S.W.2d 903, 907 (Tex. Crim. App. 1983); *see also* Tex. Code Crim. Proc. Ann. art. 35.16(a)(9) (authorizing challenge for cause for jurors with bias or prejudice in favor of or against the defendant). We determine whether withheld information is material by analyzing if the information "would likely reveal the juror harbored a bias or prejudice to such a degree that the juror should have been excused from jury service." *Sypert v. State*, 196 S.W.3d 896, 900 (Tex. App.—Texarkana 2006, pet. ref'd). "[I]f a situation arises where *material* information was withheld by a juror during voir dire, and if the appellant's subsequent motion for mistrial is denied, on appeal the denial of that motion will be reviewed for constitutional error." *Id.*

### 2. Pertinent Facts

After Officer Tran testified, the trial court notified appellant that one of the jurors had not disclosed that her uncle was a member of the College Station Police Department. The juror informed the bailiff that her uncle's status as law enforcement officer would not affect her ability to serve as a juror.

Nonetheless, appellant's trial counsel said, "[I[f we had been aware of that yesterday, [she] might have been somebody we would [have wanted to] strike . . . for obvious reasons." The trial court asked if appellant's trial counsel wanted to question the juror, and he replied that he did not think that talking further with the juror would be helpful. Appellant's trial counsel said, "I think we could have used a strike on her if we had known that information[,] and we did not know it so we were unable to do that. In fact, I can almost guarantee if I knew that" the juror was related to this specific officer, "I would have

27

struck her for the same reasons that I would have struck some of the other members of the jury panel for that same reason." The State replied that other members of the jury also had family members who were in law enforcement. Appellant insisted that he would have first stricken the complained-of juror had he known she was related to a law enforcement officer, and he requested a mistrial.

The trial court replied that the alternate juror could replace the complained-of juror. The State agreed with the trial court's recommendation. The trial court asked appellant if he objected to the remedy. Appellant said, "I don't have an objection to it, but I do move for a mistrial." The trial court denied the request and replaced the complained-of juror with the alternate juror.

### 3. Analysis

In *Decker*, the Texas Court of Criminal Appeals held that mere familiarity with a witness is not necessarily material information. 717 S.W.2d at 907. The juror in *Decker* recognized the complaining witness when the witness was called to testify and informed the trial court that he knew the witness. *Id.* The *Decker* court stated that there was no evidence that the juror intentionally gave false information to the attorneys during voir dire. *Id.* The *Decker* court further explained that the fact that the juror merely knew the complaining witness as an acquaintance was not material as "[t]here was no evidence that the two men" had ever "socialized together or had any type of friendship." *Id.* Thus, there was no evidence that the juror's relationship with the witness had any potential for prejudice or bias. *Id.*

Likewise, here, there is no evidence that the complained-of juror intentionally failed to disclose that her uncle worked as a law enforcement officer. In addition, the juror's prejudice or bias must "touch[] on some fundamental component of the charged crime or personal characteristic of the accused." *Sypert*, 196 S.W.3d at 901. Here, there is nothing in the record showing that the complained-of juror harbored any prejudice or bias on some fundamental component of the charged crime or against appellant merely because her uncle was a law enforcement officer. *See id.* Therefore, we cannot conclude that information that the complained-of juror's uncle was a law enforcement officer was material. *See id.* (providing an example as follows: "if the defendant is charged with an intoxication offense, it is material information that the prospective juror has a prejudice against persons who use alcohol"). Accordingly, because there is no showing that appellant was deprived of an impartial jury or denied a fair trial in any way because of the trial court's refusal to grant a mistrial on the basis that the complained-of juror failed to disclose during voir dire that she was related to a law enforcement officer, we find that the trial court did not abuse its discretion. *See Decker*, 717 S.W.2d at 907; *see also Allbright v. Smith*, 5 S.W.2d 970, 971 (Tex. Comm. App. 1928) ("The mere fact that a juror knows, or is a neighbor, or an intimate acquaintance of, and on friendly relations with, one of the parties to a suit, is not sufficient basis for disqualification, or ordinarily even ground for challenge for cause.").

Moreover, the complained-of juror did not serve on the jury to determine appellant's guilt or punishment, and appellant has not provided any authority, and we find none, which requires for a trial court to grant a mistrial in this scenario, especially when

appellant did not object to the trial court's replacement of the complained-of juror with an alternate juror. *See* TEX. R. APP. P. 38.1(i). Therefore, we cannot conclude that appellant was entitled to a mistrial, and we conclude that the trial court cured error, if any, by replacing the complained-of juror with the alternate juror. *See Sypert*, 196 S.W.3d at 900 (explaining that if we are convinced beyond a reasonable doubt that the juror's failure to disclose "material information did not contribute to the defendant's conviction or punishment," we are not required to reverse). We overrule appellant's fourth issue.

## C.    State's Exhibit 5A

By his fifth issue, appellant argues that he was entitled to a mistrial because when the State published State's Exhibit 5A, the jury heard a statement from radio traffic excerpt: "I have one that's unconscious. One that's unresponsive" which appellant argued "refers to the murder." Appellant bases his argument on a claim that this evidence constituted "prejudicial extraneous offense statements."

There is nothing in the record connecting appellant to a murder or to an injured individual during the guilt/innocence portion of the trial. *See McKay*, 707 S.W.2d at 32. Therefore, this evidence does not constitute extraneous offense evidence. *See id.* Thus, the trial court did not abuse its discretion by not granting a mistrial on this basis. We overrule appellant's fifth issue.

## V.    CUMULATIVE ERROR

By his sixth and final issue, appellant contends that he was denied a fair trial due to cumulative error. However, we have overruled all of appellant's issues. Therefore, his cumulative-error complaint lacks merit because there is no error to cumulate. *See Jenkins*

*v. State*, 493 S.W.3d 583, 613 & n.82 (Tex. Crim. App. 2016) ("Though it is possible for a number of errors to cumulatively rise to the point where they become harmful, we have never found that 'non-errors may in their cumulative effect cause error.'" (footnotes omitted) (citing *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009))). Accordingly, we overrule sixth issue.

## VI.    CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
26th day of October, 2023.

31